IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| SUZANNE REYNOLDS, ET. AL., | ) | |
| | ) | Case No. 4:07-CV-00001 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| FREIGHTLINER LLC, ET. AL. | ) | |
| | ) | By: Jackson L. Kiser |
| Defendants. | ) | Senior United States District Judge |

Before me now are Four Winds International Corporation's Motions to Dismiss the Plaintiffs' claim under the Virginia Motor Vehicle Warranty Enforcement Act and the first part of the Plaintiffs' claim under the Virginia Consumer Protection Act pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons stated herein, Four Winds International Corporation's Motion to Dismiss Plaintiffs' Claim Under the Virginia Consumer Protection Act will be **GRANTED**. Nonetheless, the Plaintiffs will be granted leave to amend their claim under the Virginia Consumer Protection Act within ten days from the entry of this *Memorandum Opinion* and accompanying *Order*. Moreover, Four Winds International Corporation's Motion to Dismiss Plaintiffs' Claim Under the Virginia Motor Vehicle Warranty Enforcement Act will be **DENIED**. Finally, the Plaintiffs' Motion to Strike will be **DENIED**.

## I.     STATEMENT OF FACTS

On August 22, 2005, the Plaintiffs, Suzanne and Henry Reynolds ("the Reynoldses"), purchased a recreational vehicle ("RV") from McGeorge's Rolling Hills RV ("McGeorge's") in Richmond, Virginia. Defendants Freightliner LLC ("Freightliner") and Four Winds

1

International Corporation ("Four Winds") built the RV. Freightliner built the chassis on November 23, 2004. Freightliner designed the chassis as an incomplete vehicle and ultimately provided the chassis to Four Winds. Four Winds added a cabin to the chassis, thereby completing the RV. Both manufacturers offered express written warranties on all or part of the completed motor vehicle.

The RV was a 2005 Mandalay model. The sales brochure for that vehicle stated that Four Winds was "so confidant in the design and construction of the Mandalay that [Four Winds offered] an exclusive full three year, 36,000 mile warranty with bumper to bumper coverage." A picture of the Mandalay in the brochure bore an icon touting the three year, 36,000 mile warranty. The Reynoldses believed that Four Winds was an authorized servicer of the component parts of the RV, including the chassis supplied by Freightliner. Consequently, they believed that the "bumper to bumper" warranty included the motorized chassis. When the Reynoldses purchased the RV, McGeorge supplied them with a copy of the brochure, which they relied on in making their purchase. The actual warranty did not cover anything warranted by another entity, including the chassis manufactured by Freightliner.

The RV began to malfunction shortly after the purchase. As a result, the Reynoldses returned the vehicle to McGeorge's for several repairs. On February 8, 2006, the Reynoldses, McGeorge's, and Four Winds entered into an agreement which released McGeorge's and Four Winds from liability for all claims of which the Reynoldses knew at that time. As part of that release, the parties agreed to have a different Four Winds service representative in Greensboro, North Carolina repair the Reynnoldses' RV.

On May 3, 2006, the service representative in Greensboro discovered that the entire front

2

structure of the RV was defective. This defect, the representative asserted, would prevent the service center from repairing a windshield problem unless it took the RV to Indiana to disassemble the front of the RV. Despite this defect, the service representative assured the Reynoldses that the RV remained safe to use. Ten days later, the Reynoldses picked up the RV from the service center to drive it home. Before they arrived, the powered steps and three other electrical items in the RV stopped working.

The Reynoldses reported the new electrical problems to Four Winds on May 15, 2006. Four Winds promised to send a new circuit board to fix the problems at once. When the Reynoldses did not receive the circuit board promptly, they called Four Winds again. This time, Four Winds stated that it would not be sending the circuit board. The Reynoldses responded by sending a letter to Four Winds that catalogued the RV's deficiencies on May 22. Two days later, the circuit board arrived, and the Reynoldses installed it themselves.

On June 11, 2006, the Reynoldses drove the RV to Nashville, Tennessee on a camping trip. During the trip, the electrical system malfunctioned, overcharged the batteries, and caused them to spray sulphuric acid all over the battery compartment. As a result, the RV smelled of rotten eggs for weeks.

On June 19, 2006, Mr. Reynolds called Four Winds to arrange a refund. Dave Boots of Four Winds refused to issue a refund but again offered to take the RV to Indiana for further repairs. Seeing no alternative, Mr. Reynolds agreed to Four Winds's offer. A Four Winds employee arrived on June 21 to drive the RV to Indiana. At that time, Mr. Reynolds provided the employee with a list of seventeen additional defects. Mr. Reynolds asked the employee to have someone call him once the RV arrived to discuss the additional defects.

3

Nearly a month later, on July 17, Carl Searer of Four Winds called the Reynoldses and claimed that the front structure was not actually defective. A week later, Scott Harris ("Harris"), also a Four Winds employee, called to make arrangements for the Reynoldses to fly to Indiana to pick up their RV. At that time, Mr. Reynolds asked if Four Winds had completed the remaining seventeen repairs to the RV. Harris indicated that he was unaware of the additional repairs. Consequently, Mr. Reynolds faxed the list of additional defects in the RV to Four Winds. Again, Harris called the Reynoldses on August 7 to inform them that the repairs were complete and ask them to retrieve their RV. Mr. Reynolds asked Harris to fax him an invoice of the completed repairs so he could compare it with his list to ensure that Four Winds completed all the necessary work. Moreover, Mr. Reynolds indicated that he was reluctant to fly to Indiana to pick up the RV due to the inconvenience of the trip and Four Winds's uneven history of repairing the vehicle. Four Winds agreed to deliver the RV to the Reynoldses.

Unexpectedly, Four Winds called the Reynoldses on August 15 and left a message asking to talk about the satellite dish antenna, allegedly fully repaired a week before. The Reynoldses had never previously complained about the antenna. A few days later, Four Winds called and said that the repairs were complete. Mrs. Reynolds asked for the invoice. Harris claimed that he had forgotten about the invoice and faxed it to the Reyndoldses that day. On August 22, Mr. Reynolds spoke with Harris about several items on the invoice that were not broken when Four Winds picked up the RV. Particularly, the invoice showed that Four Winds had installed an exhaust pipe extension and replaced the rear mud flap. Harris stated that he did not know why the invoice showed those repairs but promised to find out.

Two days later, much to the Reynoldses' surprise, a Four Winds employee called and

4

told them that he was in Roanoke and would drop the RV off shortly. The RV was very dirty, and certain repairs had been poorly executed. Four winds failed to fix the acid damage on the battery compartment door, and the screws had further rusted in that compartment. The left windshield was bowing out and a tear in the carpet near the driver's feet remained. A chip in the steps was unrepaired, and one broken sun visor dangled from the roof. The bumper had a huge scratch, and "there was trash on the paint on the front."

Moreover, the rear frame rails were scratched in a way they should not have been, but the mud flap was not damaged. In fact, Four Winds evidently replaced the mud flap: it still had film covering on it. "A thick steel fitting between the flap and the rails was bent almost 90 degrees and the paint had been scraped off." The rear corner of the RV had been repainted. The Reynoldses suspect that Four Winds damaged RV while it was in their care and that many of these strange alterations were efforts to conceal the damage.

## II. PROCEDURAL HISTORY

The Reynoldses filed this law suit on January 9, 2007. The Amended Complaint, which the Reynoldses filed on April 26, 2007, states claims against Four Winds and Freightliner for violation of the Virginia Motor Vehicle Warranty Enforcement Act ("Lemon Law"), violation of the Magnuson Moss Warranty Act, and breach of warranty. The Complaint asserts additional claims against Four Winds for consumer fraud in violation of the Virginia Consumer Protection Act ("VCPA"), actual fraud, and grossly negligent damage to property by a bailee. On May 16, 2007, Four Winds filed a Motion to Dismiss Plaintiffs' Claim Under the Virginia Consumer Protection Act and a Motion to Dismiss Plaintiffs' Claim Under the Virginia Motor Vehicle Warranty Enforcement Act. The Reynoldses filed briefs in opposition to the motions on June 4

and June 8, and Four Winds replied to those briefs on June 8 and June 12. Finally, the Reynoldses filed a Motion to Strike on June 14, 2007, which Four Winds responded to on June 26. I heard arguments on all of those motions on July 17, 2007. Thus, the issues are fully briefed and ripe for decision.

## III.  STANDARD OF REVIEW

Dismissal of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure is limited to "the extraordinary case where the pleader makes allegations that show on the face of the complaint some insuperable bar to relief." *Browning v. Vecellio & Grogan, Inc.*, 945 F. Supp. 930, 931 (W.D.Va. 1996) (internal quotation omitted). When "considering a motion to dismiss, the court should accept as true all well-pleaded allegations" and construe those allegations in the light most favorable to the plaintiff. *Mylan Labs, Inc. v. Matkar*, 7 F.3d 1130, 1134 (4th Cir. 1993). While the complaint need not provide detailed factual allegations, the basis for relief in the complaint must state "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). Assuming the factual allegations in the complaint are true, they "must be enough to raise a right to relief above the speculative level." *Id*.

## IV.  DISCUSSION

### A.  Virginia Consumer Protection Act

The Reynoldses' claim under the VCPA actually asserts three causes of action under that act. Four Winds's Motion to Dismiss Plaintiffs' Claim Under the Virginia Consumer Protection Act only addresses one of those claims. The claim at issue is the Reynoldses' assertion that Four Winds used "deception in connection with a consumer transaction, in violation of Virginia Code

§ 59.1-200, in that they misrepresented the fact of and the extent of [the] wreck damage" that allegedly occurred while Four Winds possessed the RV.

In the VCPA, §59.1-200 lists which acts are illegal, but § 59.1-204 provides the private cause of action for those acts. VA. CODE ANN. §§ 59.1-200, 59.1-204 (2006). Under that section, only a "person who suffers loss as the result of a violation of this chapter shall be entitled to initiate an action to recover." VA. CODE ANN. § 59.1-204. At oral argument, the Reynoldses conceded that their Amended Complaint does not demonstrate how the alleged misrepresentations injured them. Thus, this portion of the VCPA claim must be dismissed. Nonetheless, the Reynoldses indicated that they would like time to reflect on this claim to consider if the misrepresentation in fact caused them any harm. Therefore, they will be granted leave to amend this portion of their claim if they can point to some harm they suffered as a result of the alleged misrepresentation. If the Reynoldses choose to amend their VCPA claim, they must do so within ten days of the entry of this *Memorandum Opinion* and accompanying *Order*. Finally, the Reynoldses' Motion to Strike related to Four Winds's reply brief on this issue. Because I will grant Four Winds's motion to dismiss for reasons other than those contained in the reply brief, that motion will be dismissed as moot. Naturally, the remaining portions of the Reynoldses' VCPA claim should proceed.

**B. Virginia Motor Vehicle Warranty Enforcement Act**

Four Winds asserts that the Reynoldses' claim against Four Winds based on the Lemon Law must be dismissed because the part of the RV produced by Four Winds is not a motor vehicle and Four Winds is not a manufacturer as defined in that act. Under the Lemon Law,

If the manufacturer, its agents or authorized dealers do not conform the motor vehicle to any applicable warranty by repairing or correcting any defect or

7

condition, including those that do not affect the driveability of the vehicle, which significantly impairs the use, market value, or safety of the motor vehicle to the consumer after a reasonable number of attempts during the lemon law rights period, the manufacturer shall:

1. Replace the motor vehicle with a comparable motor vehicle acceptable to the consumer, or

2. Accept return of the motor vehicle and refund to the consumer, lessor, and any lienholder as their interest may appear the full contract price . . .

VA. CODE ANN. §59.1-207.13 (2006). Section 59.1-207.11 defines a motor vehicle as "only passenger cars, pickup or panel trucks, motorcycles, self-propelled motorized chassis of motor homes and mopeds as those terms are defined in § 46.2-100 and demonstrators or leased vehicles." VA. CODE ANN. §59.1-207.11 (2006). Thus, Four Winds asserts that the only portion of the RV that is a motor vehicle for purposes of the Lemon Law is the chassis. Consequently, the part of the RV manufactured by Four Winds is not subject to the Lemon Law. Moreover, the Lemon Law defines a manufacturer as a company "engaged in the business of manufacturing or assembling motor vehicles." *Id.* Because Four Winds did not produce the chassis, it contends that it is not engaged in the business of manufacturing or assembling motor vehicles. As a result, Four Winds asserts that it is not a manufacturer under the definition provided in the Lemon Law.

The Reynoldses contend that the entire RV actually qualifies as a motor vehicle under the statute. As noted above, the definitions section of the Lemon Law states that motor vehicle means "only passenger cars, pickup or panel trucks, motorcycles, self-propelled motorized chassis of motor homes and mopeds as those terms are defined in § 46.2-100 and demonstrators or leased vehicles." VA CODE ANN. § 59.1-207.11. The Reynoldses argue that the phrase "as those terms are defined in § 46.2-100" modifies all of the elements in the list that proceed it. In

8

section 46.2-100, "passenger cars" are defined as "every motor vehicle other than a motorcycle designed and used primarily for the transportation of no more than 10 persons including the driver." VA CODE ANN. § 46.2-100 (Supp. 2007). That same statute defines a motor home as a "private motor vehicle with a normal seating capacity of not more than 10 persons, including the driver, designed primarily for use as living quarters for human beings." *Id.* Thus, a motor home is apparently a passenger car under section 46.2-100. Moreover, that section specifically states, "Any structure designed, used, or maintained primarily to be loaded on or affixed to a motor vehicle to provide a mobile dwelling, sleeping place, office, or commercial space shall be considered a part of a motor vehicle." *Id.* Consequently, if the modifying phrase "as those terms are defined in § 46.2-100" modifies the phrase "passenger cars" in section 59.1-207.11, then it appears that the entirety of the RV may be included in the definition of a motor vehicle under the Lemon Law.

Four Winds argues that the modifier does not apply to the term "passenger cars." Rather, Four Winds asserts that the definition in section 59.1-207.11 is a list consisting of the following elements: "passenger cars," "pick up or panel trucks," "motorcycles," "self-propelled motorized chassis of motor homes and mopeds as those terms are defined in § 46.2-100," and "demonstrators or leased vehicles with which a warranty was issued." Logically, because the legislature placed the modifier next to one element in the middle of the list, and not at the end of the list, it should only modify the element paired with it. As a result, Four Winds contends that the modifier does not modify the phrase "passenger cars."

While Four Winds's interpretation of the statute is grammatically correct, it ignores another correct construction of the statute that yields the opposite result. Instead of acting as one

long list, the definition in question might be a two part list, the first part of which consists of several elements. Under this reading, the first part of the list would contain the elements: "passenger cars," "pick up or panel trucks," "motorcycles," "self-propelled motorized chassis of motor homes" and "mopeds." The second part of the definition would be the phrase "demonstrators or leased vehicles with which a warranty was issued." If this reading is correct, then the modifier would be placed at the end of a list and would logically touch all the preceding elements, including "passenger cars."

Unfortunately, because the legislature declined to place commas before the word "and" in lists of three or more, this statute is perfectly ambiguous: both readings are grammatically correct.[1] The Virginia Supreme Court has held that "the plain, obvious, and rational meaning of a statute is always to be preferred to any curious, narrow, or strained construction." *Turner v. Commonwealth*, 226 Va. 456, 459, 309 S.E.2d 337, 338 (1983). In this case, it would be strange if the legislature thought that the phrases "mopeds" and "mobile homes" were sufficiently ambiguous to define but not the phrases "passenger cars," "pick up and panel trucks," and "motorcycles." As the Reynoldses point out, referring to section 46.2-100 to define those phrases will provide many useful definitions for terms that could otherwise be ambiguous. Section 59.1-207.11 does not clearly indicate if limos, SUVs, vans, four-door trucks, and three wheeled motorcycles are included in the Lemon Law. Section 46.2-100 provides answers to all

---

[1]Four Winds notes that another court in the Western District recently found that a manufacturer that only added parts to a self-propelled motorized chassis to produce a motor home did not produce a motor vehicle under the Lemon Law. *Parks v. Newmar Corp.*, 384 F. Supp. 2d 966, 969 (W.D. Va. 2005). Nonetheless, that case did not consider the effect of section 46.2-100 on section 59.1-207.11. *Id*. at 969. Consequently, that holding is of limited value in this case.

10

of those questions by clearly defining the terms of section 59.1-207.11. This conclusion is all the more sensible in light of the fact that the phrases "demonstrators," "leased vehicles," and "warranty" are not defined in section 46.2-100, which explains why the modifier appears before those phrases under the Reynoldses's reading. As a result, I believe that the reading of the definition of motor vehicle in section 59.1-207.11 favored by the Reynoldses is the superior one because it provides greater clarity for the terms in the statute and avoids the curious results that arise from adopting Four Winds's interpretation. Moreover, the statutes is a remedial one and must be read broadly to accomplish its intended purpose — protecting purchasers of motor vehicles. *Valley Acceptance Corp. v. Glasby*, 230 Va. 422, 428, 337 S.E.2d 291, 295 (1985). Thus, I find that the Lemon Law does include the parts of the RV manufacturer by Four Winds and that, therefore, Four Winds is a manufacturer under the Lemon Law. In light of these findings, I will deny Four Winds's motion to dismiss this claim.[2]

It may appear that this result violates the well established cannon of statutory construction that "[w]hen one statute addresses a subject in a general manner and another addresses a part of the same subject in a more specific manner, the two statutes should be harmonized, if possible, and when they conflict, the more specific statute prevails." *Alliance to Save the Mattaponi et al. v. Commonwealth, et al.*, 270 Va. 423, 439–40, 621 S.E.2d 78, 87 (2005). In this case the definition of a motor vehicle supplied by section 46.2-100 is quite broad and would appear to cover all parts of a motor home. In contrast, section 59.1-207.11 narrowly defines a motor vehicle as only the self-propelled chassis of the motor home. As a result, one

---

[2]Based on this finding, I need not consider the Reynoldses' argument that Four Winds is estopped from claiming that it is not a manufacturer and that the portions of the RV it produced do not qualify as a motor vehicle under the Lemon Law.

could argue that because one provision broadly includes all the parts of a motor home in the definition of a motor vehicle and one provision only includes the chassis, the narrower definition should prevail and only the self-propelled chassis should be considered a motor vehicle under the Lemon Law.

Nonetheless, the rule that when two statutes conflict, the more specific statute prevails only applies when the two statutes cannot be harmonized. These two statutes can be harmonized. The term "passenger cars" in section 59.1-207.11 includes the entire RV. Nevertheless, if this were the only term in the definition, then Freightliner would not qualify as a manufacturer under the Lemon Law. The Lemon Law defines a manufacturer as a "person, partnership, association, corporation or entity engaged in the business of manufacturing or assembling motor vehicles." Under this definition, Freightliner would not be a manufacturer because the product it produced, the self-propelled motorized chassis, does not qualify as a passenger car under 46.2-100 because it is not designed and used for the transportation of ten people or less. It is not designed and used to transport any people. Rather, the product is made with the intention of being sold to a secondary manufacturer, like Four Winds, which assembles the cabin and produces the final motor home. Consequently, I believe that the two statutes can be harmonized. Including motor homes in the definition of passenger cars ensures that consumers can hold motor home manufacturers to their warranties under the Lemon Law. The additional provision in section 59.1-207.11 also protects consumers against a manufacturer that produces the chassis, a protection that would not be granted otherwise. This conclusion is in keeping with the expressed intent of the General Assembly to alleviate the hardship on a consumer caused by the purchase of a defective motor vehicle. VA. CODE ANN. § 59.1-207.10 (2006). As this case

12

demonstrates, the hardships caused by defects in the cabin of the RV may be as severe as those caused by defects in the chassis.

Another objection to this result may be that it violates the rule of statutory construction that "no part of an act should be treated as meaningless unless absolutely necessary." *Garrison v. First Fed. Sav. and Loan Ass'n. of South Carolina*, 241 Va. 335, 340, 402 S.E.2d 25, 28 (1991). At first glance it may appear that the phrase "self-propelled motorized chassis of motor homes" in the definition of motor vehicles is redundant if the earlier phrase "passenger cars" includes all parts of motor homes. Nonetheless, as discussed above, this provision serves an important function in that it ensures that a manufacturer of a chassis will be liable under the Lemon Law, even though the manufacturer has not produced a passenger car within the meaning of the statute.

### V.    CONCLUSION

For the reasons stated above, I will **GRANT** Four Winds's motions to dismiss the first part of the Reynoldses' claim under the Virginia Consumer Protection Act and **DENY** Four Winds's motion to dismiss the Reynoldses' claim under the Virginia Motor Vehicle Warranty Enforcement Act. The Reynoldses will be granted leave to amend the first part of their claim under the Virginia Consumer Fraud Protection Act, if they choose, within ten days from the entry of this *Memorandum Opinion* and accompanying *Order*. Finally, I will **DENY** the Reynoldses' Motion to Strike.

13

The clerk is directed to send a copy of this *Memorandum Opinion* and the accompanying

*Order* to all counsel of record.

Entered this 2nd day of August, 2007.


s/Jackson L. Kiser
Senior United States District Judge